24 N.J. Super. 576 (1953)
95 A.2d 161
LAURA H. SWANSON AND VICTOR H. SWANSON, PLAINTIFFS-RESPONDENTS,
v.
PAUL C. WIESENFELD, DEFENDANT-APPELLANT, AND SOL GURSHMAN, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1952.
Decided February 16, 1953.
*578 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Samuel Milberg argued the cause for the plaintiffs-respondents (Mr. Victor Ruskin, attorney).
Mr. John E. Toolan argued the cause for the defendant-appellant (Messrs. McGlynn, Weintraub & Stein, attorneys; Mr. Edward R. McGlynn, of counsel).
*579 The opinion of the court was delivered by EASTWOOD, S.J.A.D.
Defendant Paul C. Wiesenfeld appeals from the final judgment entered against him in the amount of $100,000 in favor of plaintiff Laura H. Swanson, and $25,000 in favor of plaintiff Victor H. Swanson, subsequently reduced by the court to $70,000 and $20,000 respectively.
The action was one grounded in tort wherein Mrs. Swanson sought recovery of damages for injuries allegedly attributable to the malpractice or negligence of the defendants Paul C. Wiesenfeld and Sol Gurshman, who treated her for her injuries. Her husband sued per quod. The case was tried before the Superior Court, Law Division, Middlesex County, and a jury. A verdict of no cause of action was returned in favor of the defendant, Dr. Sol Gurshman.
On Sunday morning, May 7, 1950, Mrs. Laura H. Swanson, then 55 years of age, stepped out the back door of her home on to a porch to empty some trash when a gust of wind blew the storm door against her, knocking her off the porch backwards to the ground, causing a comminuted fracture of her right leg in the area of the knee. The Metuchen Safety Squad ambulance was summoned, and after applying first aid, removed her to the Perth Amboy Hospital. Dr. Sol Gurshman, the family physician, was called by Mr. Swanson and he arranged for Mrs. Swanson to be treated by Dr. Wiesenfeld, an orthopedic surgeon.
The admitting diagnosis and examination report and X-rays showed fractures of the tibial plateau of the knee and also the fibular head. Multiple fragments of the tibia were observed. Under anesthesia, a closed reduction (cast) was applied from mid-thigh to the toes. The post-operative condition of the patient appeared good and X-ray reports of the post-reduction of the leg, ankle and knee showed the femur to be normal, and a comminuted fracture of the lateral 1 1/2 inch of the tibia, with moderate spreading of the fragments and a fracture through the neck of the fibula without displacement.
*580 Mrs. Swanson's leg was elevated and an ice cap applied to her knee. Later in the afternoon of the same day Dr. Wiesenfeld visited the patient at the hospital and asked how she felt. She complained of pain in her leg. The doctor told her to work her toes as much as she could. Later in the day morphine and a sedative were administered to assist Mrs. Swanson in rest.
The next day, Monday, the patient received some morphine to deaden the effect of the pain in her knee. It was noted that she slept long intervals and that circulation appeared good in the toes, although she could not work them.
On at least two occasions, on the theory that Mrs. Swanson was neurotic, a placebo (sterile) injection was administered and she was noted to be sleeping thereafter.
On Tuesday, May 9, the patient complained of pain and that she could not move her toes. Again, on Wednesday, May 10, she reported inability to move her toes. It was noted that her toes had become bluish in color and were somewhat cold. Dr. Wiesenfeld bivalved the cast and the circulation seemed to improve. Mrs. Swanson rested comfortably for the remainder of the day.
On Thursday, May 11, Dr. Wiesenfeld removed the cast and noted that there was no sensation or motion in the patient's toes and that they were bluish in color. He ordered a spinal anesthesia, but the right foot failed to "warm up." He then ordered a lamp treatment to the foot. Dr Gurshman came in and ordered the lamp turned off and called Dr. Isabelle M. London, a peripheral vascular specialist, for a consultation with him and Dr. Wiesenfeld. Dr. London ordered the patient's leg lowered and head elevated and suggested the use of an oscillating bed. The patient was transferred in the afternoon of the same day to St. Peter's Hospital in New Brunswick, where an oscillating bed was available and to have Dr. Norman Rosenberg, associate with Dr. London.
The final diagnosis at Perth Amboy Hospital had been a fracture of the right tibial plateau, a fracture of the neck of the right fibular and thrombosis of the popliteal artery.
*581 Three operations were performed upon Mrs. Swanson by Dr. Rosenberg: on May 11, longitudinal incisions into the lower leg to reduce the pressure; on May 14, a guillotine amputation below the knee; and on June 2, another amputation above the knee, at approximately mid-thigh.
The amputations were made necessary by a gangrenous condition which had developed by reason of interference with circulation in the patient's leg. The cause of the interference with circulation and the question of whether the attending physicians, named as defendants in the matter, should have foreseen this difficulty or ought reasonably to have anticipated it and guarded against it, is the crux of the issue in this case. The plaintiffs contend that the blood supply to the leg was cut off by the normal swelling of the leg beneath the cast, in the vicinity of the fracture, and that the cast should have been bivalved prior to May 10, 1950, and that defendant's failure to do so was the proximate cause of the gangrene. The defendant contends that failure to bivalve the cast was not the proximate cause of the gangrene; that the necessity for the amputation was the obliteration of the anterior tibial artery, at the site of the fracture caused by the fracture and the consequent cutting off of the blood supply.
The defendant contends that the trial court erred: (1) in permitting Dr. Tuby to answer the hypothetical question propounded to him; (2) in denying his motion for involuntary dismissal at the close of the plaintiffs' case and at the conclusion of all of the evidence in the case; (3) that the verdicts were so palpably against the weight of the evidence on proximate cause as to demonstrate that they were the products of sympathy, passion, prejudice and bias; (4) in denying a new trial on certain alleged misconduct of jurors; and (5) in reducing the verdict rather than setting it aside in its entirety.
At the close of the defendant's case counsel for defendant, Wiesenfeld, successfully moved to strike three subparagraphs of the complaint, that were not supported by the proofs.
*582 We wish to direct our attention first to the question of the sufficiency of the weight of the evidence to support the verdict returned by the jury. Such a consideration demands a more detailed review of the evidence proffered by the parties.
Initially, we direct our attention to the testimony of Dr. Tuby, plaintiffs' expert. It will be noted that Dr. Tuby did not attend nor examine Mrs. Swanson, but testified for plaintiffs after a review of the hospital records. From a hypothetical question propounded to Dr. Tuby, he stated that "failure to loosen, bivalve or remove the plaster cast on the patient's right lower extremity, prior to May 10th, 1950, was a departure from and at variance with the usual, good, ordinary, sound and accepted medical practice," and that such failure "would be a competent and producing cause of circulatory interference, resulting in gangrene."
Thereafter Dr. Tuby explained that his theory was that the circulatory interference was caused by the normal swelling in the area of the knee of the right leg and the pressure produced thereby was confined within the closed cast, and defendant having failed to bivalve it, the flow of blood was cut off, resulting in a gangrenous condition necessitating the amputation. On cross-examination of Dr. Tuby as to the source of the factual element of swelling and pressure he relied upon for his conclusion, he admitted that it was not given to him as a factual hypothesis and that the records which he had examined did not contain evidence of it. The plaintiffs did not testify to swelling of the limb and Mrs. Swanson reported no pressure. Dr. Tuby assumed there was swelling because Mrs. Swanson complained of pain and that pain normally is an indication of swelling in fractures.
Our courts have ruled that:
"The opinions and conclusions of experts must be based either upon facts within their own knowledge which they detail to the jury or upon hypothetical questions embracing facts supported by the evidence and relating to the particular matters upon which the expert opinion is sought, which facts, for the purpose of the opinion, are assumed to be true." Beam v. Kent, 3 N.J. 210, 215 (1949).
*583 It has generally been conceded that the opinion of an expert must be grounded in established facts or hypothesis assumed by the question posed to him, or his conclusions are worthless and inadmissible.
As stated in 2 Wigmore on Evidence (3rd ed.), sec. 672, pp. 792-793:
"1. Testimony in the shape of inferences or conclusions rests always on certain premises of fact. * * * 2. These premises, a consideration of which is essential to the formation of the conclusion or opinion, must somehow be supplied to the jury by testimony. * * * 3. If * * * a witness is put forward to testify to the conclusion, the premises considered by him must be expressly stated, as the basis of his conclusion; otherwise, since his conclusion rests for its validity upon a consideration of the premises, the tribunal, if those premises are not made to accompany the conclusion, might be accepting a conclusion for which the witness had considered premises found by the tribunal not to be true. 4. Hence, the premises must be stated hypothetically in connection with the conclusion; * * *."
In the matter sub judice, neither the matter of pressure and swelling, nor the extent thereof assumed by Dr. Tuby in his conclusions concerning proximate cause, were supplied by evidence of the case or the hypothesis of the question posed.
Plaintiffs introduced no evidence attacking the type, manner of application or construction of the cast applied to Mrs. Swanson's leg. Dr. Tuby stated that he had not examined it, did not know how it was padded and did not know how restricting it was on the patient's leg.
Neither the patient nor her husband complained of swelling or pressure on her leg. The defendants proffered testimony that they did not observe any swelling of the limb or other indications of pressure. Furthermore, on removal of the cast it was observed that the skin of the member was not affected with blebs, bullae or ulcerations or other marks on the leg indicating pressure within the cast.
Mrs. Swanson was checked frequently and regularly by Doctors Gurshman and Wiesenfeld, and they testified they *584 observed no symptoms of circulation interference up to the time the cast was bivalved on May 10. The following morning, the patient's toes were cyanotic and indicated circulation interference. Various methods were used to correct the condition. Dr. Isabelle M. London, a peripheral vascular specialist, was called into the case. Dr. Gurshman was of the opinion that the difficulty was attributable to an arterial thrombosis resulting from an injury to the artery at or near the fracture.
Dr. Rosenberg, associating with Dr. London, found on May 14, that the posterior tibial artery was pulsating at the point of amputation below the knee, but that the anterior tibial was not. This finding confirmed the opinion shared by Doctors Wiesenfeld, London and Gurshman that thrombosis was created in the lower leg by reason of damage to the artery and that gangrene developed because there was not sufficient blood supply to the structures below the site of the injury.
Dr. Wiesenfeld applied the cast to Mrs. Swanson's leg. He testified as to the manner of its application; that it was not tight; that he received no complaints of that nature and observed nothing to indicate pressure. As to the observations on his periodic visits from Sunday until the cast was bivalved on Wednesday, his testimony closely matched that of Dr. Gurshman, i.e., that no evidence of circulatory difficulties was observed.
Dr. Moolten's pathology report of June 2, 1950 showed that the anterior tibial artery was almost threadlike from its popliteal origin to the upper part of the anterior tibial space, where it lay in close relationship to the site of the fracture. The resulting condition could not, in the opinion of Dr. Wiesenfeld, have been occasioned by pressure but was the evident results of trauma arising out of the fracture accident.
Dr. Rowland, one of defendant's experts, was asked a hypothetical question containing all factual elements from the happening of the accident through the pathological findings *585 in the amputated member, and it was his opinion that there was an injury to the inside lining of the artery causing a formation, gradually and slowly, of an arterial thrombosis, which grew in size, slowly cutting off the main circulation, and ultimately the collateral circulation; that the diminution of circulation would first make itself apparent or manifest to an attending physician in the deep tendon portion of the toes; that the bivalving of the cast at an earlier date, and an inspection of the upper portion of the leg, would not have revealed that any sooner. The bivalving of the cast immediately after it had been applied and set would not have avoided the end result in this case. In Dr. Rowland's opinion, the cast did not play any part in the loss of this woman's leg. When a thrombosis eventually obstructs the whole artery, there is a complete cessation of circulation. When that occurs, from that point on the progress becomes very much more rapid. It could be so rapid that, within the space of an hour or two, observation of the lower right leg would show different conditions, so that a person seeing the lower right leg, say at 12 o'clock, and another person seeing it at two, could see an entirely different and complete change. Dr. Rowland did not think that any specialist could have recognized what was going to happen, actually, before it happened. In his opinion, anything any specialist would have done, would not have made any difference; it "could not have prevented this."
Dr. Kuhn, an orthopedic surgeon, testified for defendant and explained the protection from external pressure afforded anatomically and physiologically to the anterior tibial artery and explained that practically the only way damage could come to the blood vessel was from within, not from outside of the leg, and further, that it would take approximately three to four days before the blood vessel became completely occluded to give any symptoms thereof. The same comprehensive hypothetical question was addressed to Dr. Kuhn as was addressed to Dr. Rowland, and it was the opinion of Dr. Kuhn that Dr. Wiesenfeld exercised proper *586 skill and judgment between May 7 and 11 in treating Mrs. Swanson, and in answer to a question of whether or not the patient's leg could have been saved irrespective of treatment, he stated: "I feel that this is a case where the die was cast at the instant of the injury. The blood vessel was injured, as the accident happened, nothing could have been done one way or the other to help."
Doctors Weigel and Smith were called as experts in behalf of the defendant and, in answer to the all inclusive hypothetical question addressed to Rowland and Kuhn, testified that in their opinion Dr. Wiesenfeld used good medical practice in the treatment in this case and that the amputation resulted from a chain of circumstances resulting to the popliteal artery from the trauma inflicted in the fracture accident.
It is worthy of note that the only expert testimony in support of plaintiffs' theory of the case was that of Dr. Tuby, while defendant's four experts, who had the benefit of the testimony of three attending physicians, agreed that defendant was guilty of no culpable errors. While we are not unmindful of the principle that mere numbers of witnesses does not constitute greater weight of the evidence, we also recognize that numerical superiority in qualified experts with competent testimony does aid in establishing one's case by a preponderance of believable testimony. Gorczynski v. Public Service Interstate, etc., Co., 5 N.J. Super. 191, 194 (App. Div. 1949). Similarly, we are not unmindful of the well established principle that an attending physician is in a better position to express an opinion as to cause and effect than a medical expert. Fusco v. Cambridge Piece Dyeing Corp., 135 N.J.L. 160, 162 (E. & A. 1946).
Defendant had the benefit of testimony of the attending physicians as well as four expert witnesses. The results of the pathological study on the amputated member corroborated their theory of the case, and the hospital records and X-ray reports bore no contradictory proofs.
*587 The plaintiffs, on the other hand, had only the testimony of Dr. Tuby, their expert, who had never examined the patient and who based his opinion of error upon the hypothetical question posed to him. Dr. Tuby's testimony is based upon a premise of pressure which was not factually established. In addition thereto, the conditions present upon the removal of the cast negative the existence of the essential element to the success of plaintiffs' theory, i.e., pressure. It is further to be observed that Dr. Tuby would not state that, if Dr. Wiesenfeld had bivalved the cast and examined the patient's leg two or three days earlier, the leg would, in all probability, have been saved. He merely argued that it might have saved the leg. On the defendant's behalf, all experts agreed that: "the die was cast" when the fracture accident occurred; that the injury was then sustained to the blood vessel and nothing thereafter could have been done to avert the development of the thrombosis and resultant gangrenous condition.
It is apparent from the testimony of defendant's experts that injury to the blood vessel causing a thrombosis would not have been produced by pressure, but arises from a trauma and that circulatory interference results. This condition was proven to exist in the lower leg of the patient by the opinion of several medical specialists and by pathological study of the member itself. Several of the doctors who testified to this effect had the advantage of personal observation and examination of the patient.
It is not denied that pressure might cause circulatory interference and after sufficient time a gangrenous condition. However, to arrive at this conclusion the premise of pressure must first be assumed and in the matter sub judice, this may not be legitimately done for there is no evidence to support such an assumption.
As stated in Hager v. Weber, 7 N.J. 201, 210 (1951):
"* * * The appellate tribunal cannot invade the constitutional office of the jury; it may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury. But, if the verdict be so far contrary to *588 the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice or partiality, it cannot serve to support the judgment, and appellate correction of the error is not an interference with the constitutional security of the inferior court or the attribute of finality on the facts inherent in its judgments or the constitutional right of trial by jury. As respects the appellate corrective process, there is no essential difference between a verdict that comes from misdirection and a verdict that constitutes a palpable perversion of the jury function. A verdict that rests upon testimony competent to sustain the inference implied in such a finding is ordinarily conclusive; e converso, it is not. * * *"
It is apparent from the evidence on the plaintiffs' case that the circumstances were not such as to exclude the idea that the circulatory interference, resulting in gangrene, was due to a cause with which the defendant was unconnected. In Callahan v. National Lead Co., 4 N.J. 150, 154, 155 (1950), it is stated:
"* * * Our courts have repeatedly decided that the existence of a possibility of a defendant's responsibility for a plaintiff's injuries is insufficient. In the absence of direct evidence, it is incumbent upon the plaintiff to prove not only the existence of such possible responsibility, but the existence of such circumstances as would justify the inference that the injury was caused by the wrongful act of the defendant and would exclude the idea that it was due to a cause with which the defendant was unconnected. * * *"
"* * * where it appears that the injuries were occasioned by one of two causes, for one of which the defendant is responsible, but not for the other, the plaintiff must fail if the evidence does not show that the injury was the result of the former cause. If under the testimony it is just as probable that it was caused by the one as the other, he cannot recover." Stumpf v. Delaware, L. & W.R.R. Co., 76 N.J.L. 153, 158 (Sup. Ct. 1908).
It must be conceded that the amputation of Mrs. Swanson's leg is a most regrettable and tragic matter. The record indicates that Mrs. Swanson, a housewife, age 55 years, has, since her return home from the hospital, been able to get around although she requires some assistance negotiating stairs and the like. She wears an artificial limb and is able to walk short distances, to get out in the yard almost every day, has only part-time domestic help, and aside from the normal difficulties attendant with such a *589 condition, is able to assume her duties and station in life fairly well, although she states that she has had to give up most of her former social activities. We are not unmindful of the rule that the mere fact that an award of damages may seem to the court to be excessive, it will not in itself warrant a reversal. However, under the aforementioned circumstances, and in the light of the weight of the evidence as we have heretofore discussed it, the verdict of $100,000 is so excessive as to indicate that the jury was moved by mistake, passion or prejudice, particularly where, as here, the verdict was not supported by the greater weight of the evidence. Capone v. Norton, 8 N.J. 54 (1951); Kress v. City of Newark, 8 N.J. 562 (1952); Greenberg v. Garfield-Passaic Bus Co., 134 N.J.L. 371 (Sup. Ct. 1946).
In view of the fact that this matter must be remanded for retrial, we wish to consider the propriety of the hypothetical question posed to Dr. Tuby and whether it contained all the elements proved in their theory of the case, and whether as such it was sufficiently comprehensive for their expert to express an opinion.
The content of a hypothetical question should be predicated upon facts which the evidence tended to prove. Molnar v. Hildebrecht Ice Cream Co., 110 N.J.L. 246, 255 (E. & A. 1932). This, of necessity, depends upon the state of the case at the time the question is propounded, and in the matter sub judice it would appear that at the time the question complained of was asked of Dr. Tuby by plaintiffs' counsel the proofs of Dr. Rosenberg's findings of May 14 and the pathological study of the amputated member made on June 2 were not yet in evidence. In that posture of the case, their omission from the question propounded was not fatal.
It is stated in Schwartz v. Howard Savings Institution, 117 N.J.L. 180, 184 (E. & A. 1936):
"* * * Testimony of a qualified expert, not having personal knowledge of the facts, is proper if elicited by a hypothetical question, predicated upon the facts `in accordance with the plaintiff's theory *590 of the case and which the evidence tended to prove.' Molnar v. Hildebrecht Ice Cream Co., 10 N.J.L. 246. Conversely, when expert testimony, as offered here, would be based upon a hypothesis which excludes factors present in the evidence and patently vital to the formation of an opinion, it is properly excluded from the case."
We are of the opinion that where the testimony develops that the condition complained of may be produced by two causes, and the elements of one are established and the other lacking in proof and merely assumed for the basis of a hypothetical opinion, the inclusion of the two elements proven to exist, corroborating the proximate cause advanced by defendants, properly qualified by time and circumstances, are pertinent for the consideration of the experts in concluding as to the cause of the resultant condition. Their consideration may well have been helpful to the jury in their determination. However, we are of the opinion that their inclusion in the hypothetical question put by plaintiffs' counsel to Dr. Tuby, was not compellable in the absence of their proof in evidence at that stage of the case. Schwartz v. Howard Savings Institution, supra; Coll v. Bernstein, 14 N.J. Super. 71 (App. Div. 1951).
Consideration has been given to the other grounds of appeal advanced by the defendant-appellant, but in view of the foregoing holding, a discussion and determination of them became unnecessary.
The judgment is reversed, without costs, for a trial de novo.
FRANCIS, J.C.C. (temporarily assigned) (dissenting).
Study of the record and the exhibits forces me to dissent from the view of my colleagues that respondents' verdicts are contrary to the weight of the evidence.
The respondent, Laura H. Swanson, suffered serious and severe fractures of the tibia and fibula of the right leg at the knee joint. The report of the first X-rays taken after admission to the Perth Amboy General Hospital shows that there was a comminuted fracture of the lateral one and one-half inches of the tibia with moderate spreading of the fragments; *591 also that there was a fracture through the neck of the fibula without displacement of the fragments. These X-rays could not be found at the time of the trial in the files of either of the two hospitals involved.
The evidence indicates that this type fracture presents a problem to the attending physician as to whether it should be reduced by the closed or open method. In the closed method an effort is made through external manipulation to restore the broken bone segments to their original position and alignment, and then a cast is applied. Open reduction involves surgical opening of the leg and realignment of the bone fragments through actual contact. Which course is to be followed in a particular case is a matter for the informed judgment of the orthopedist in charge.
Here, "after deliberation," appellant decided to try a closed reduction. According to Dr. Gurshman, Dr. Wiesenfeld said he would try closed reduction, put on a cast, and "see how the extremity got along"; "if it did not develop satisfactorily he would go in and do an open reduction."
The closed reduction was done and a circular cast applied from mid-thigh to toes, the toes remaining exposed. X-rays revealed the result as "fair to good" and "the result was accepted." Circulation appeared satisfactory.
The medical evidence is to the effect that post-reduction swelling is an expected and inevitable concomitant of this type fracture. Consequently, circulatory difficulties are an ever-present danger, and they impose upon the attending orthopedist the duty of vigilance and watchfulness for signs of interference with circulation. The duty is most stringent when a closed circular cast is applied because such a cast will not yield to internal pressure caused by swelling of the leg. As respondents' medical expert put it, when the doctor elects to encase the leg he assumes responsibility for circulation.
There is no substantial disagreement among the medical witnesses in the case that persistent pain must be investigated, and upon the appearance of signs of interference with circulation the cast should be bivalved in order to study the leg *592 condition and to relieve any possible pressure within the cast. The cardinal signs of pressure are severe pain, numbness and coldness. When these appear it is mandatory to cut the cast.
According to the testimony and an anatomical chart which was received in evidence, the arteries carry the blood on the outward passage from the heart through the body and the return flow passes through the veins. The principal source of blood supply to the thigh is the popliteal artery. It runs down the thigh and bifurcates in the vicinity of the posterior part of the knee into the anterior tibial artery and posterior tibial artery. The anterior tibial artery is near the location of the fracture and passes down the front of the lower leg in fairly close proximity to the tibia. Further forking and collateral branching occurs as the arteries proceed down the leg. However, the fractures were not in contact with the artery because they were in the outer condyle of the tibia and not its entire upper head.
The injured woman asserted that she had "no particular pain" in the leg before the application of the cast. However, on coming out of the anaesthetic with the cast then on she had severe pain. Appellant visited her during the day, (this being Sunday, May 7), and she told him about it. He instructed her to work her toes but she was unable to do so. She had no feeling or sensation in them and informed him so.
The hospital record shows that Mrs. Swanson returned from the operating room at 11:30 A.M.; she complained of pain in the leg at 2:30 P.M.; "through the leg" at 3 P.M.; at 8 P.M. she was "moaning loudly with pain in the leg." Morphine was administered at 4:10 P.M. and nembutal at 8:30 P.M.
On Monday, May 8, in both the morning and afternoon when Dr. Wiesenfeld visited, she advised him of "awful pain" and "excruciating pain"; again he told her to work her toes. However, she could not comply and told him so; also she had no feeling in her foot.
*593 The hospital record for this day discloses the administration of morphine at 5:30 A.M., 10:35 A.M., 4:45 P.M., nembutal at 9 P.M., and a sterile hypo at 9:30 P.M. The nurses' notes for this day show "pain in the knee," "pain through right leg," "severe pain," "leg bothersome," "complains of severe pain in right leg," and "crying with pain in leg."
On this day, when her husband visited, she complained of pain in the leg; her toes felt cold and there was no reaction when he touched them.
On May 9, when appellant visited, she complained of "terrible pain," that she could not move or work her toes and that she had no feeling in them. However, nothing was done with respect to the cast.
The nurses' notes for this day recite: "occasional severe pain through right leg," "crying with pain." And she was given a nembutal and a sterile hypo. These sterile hypos are simply hypodermic injections of sterile water. They are given when it is thought that the patient really does not have the pain of which she complains, but is simply neurotic.
When her husband visited on this morning he noticed a slight discoloration of her foot, the toes were cold and she was not aware he was touching them. That evening also, he said, she had severe pain and no sensation in the toes.
On May 10 Dr. Wiesenfeld conceded that he found evidence of circulatory difficulties in the toes and he then bivalved the cast. He denied that Mrs. Swanson had made any prior complaints to him of any unusual or severe or persistent pain. But he admitted that he had failed to read the nurses' notes on the hospital chart at any time before bivalving the cast. He admitted that pain is one of the "cardinal" symptoms of circulatory difficulties and that if he had known that she was crying and suffering with pain on May 8 and 9, he "might have" cut the cast. He did nothing because he did not know that she had pain after the first 24 hours.
Dr. Robert Tuby, the medical expert who testified for respondents, said that the persistent complaints of severe pain and the numbness and coldness of the toes demonstrated *594 that the inevitable swelling, which always accompanies this kind of fracture, was causing the very thing which must be watched for, namely, pressure within the cast and circulatory interference. In his judgment the failure to loosen, bivalve or remove the cast and relieve that pressure prior to May 10 was a departure from the usual, sound and accepted medical practice. It was also his opinion that failure to bivalve the cast on May 7, 8 and 9 would be a competent producing cause of circulatory interference, resulting in gangrene and necessitating amputation of the leg.
It is plainly to be inferred from his statements that if the cast had been bivalved or removed on May 7 or 8 the leg would have been saved; also, that if it had been done on the 9th there might still have been a little collateral circulation that "may have saved" the leg.
Dr. Tuby's testimony is criticized because, it is said, he assumed the fact of swelling of the leg and pressure within the cast, of which there was no evidence. If he did assume the fact of swelling, the assumption was of a universally accepted medical fact which no medical man in the case disputed, i.e., that swelling is the normal concomitant of this type fracture. Recognition of that fact forms the basis for the rule among physicians that watchfulness for circulatory difficulties is mandatory following application of the cast.
But more than this, there was physical evidence of swelling and pressure. After the cast had been bivalved and the patient removed to St. Peter's General Hospital on May 11, examination revealed that the leg was swollen and that there were blebs and bullae in the skin. Blebs are small superficial blisters; bullae are larger and deeper blisters. Both come from pressure.
Moreover, Dr. Gurshman, who was exonerated by the jury, said that if there was pressure within the cast, upon its removal, there would be ulcers or discolorations present and some ridges where the pressure was. And Dr. Elmer P. Weigel, another orthopedic specialist, who appeared on behalf of appellant, after saying that it is "absolutely impossible" to *595 be positive as to whether the cast played any part in the production of the gangrene, testified that if the cast were sufficiently tight to cause pressure against the blood vessels "it should have traumatized the skin in the area, somewhat, at least." In this connection, therefore, it seems highly important to note that on the May 11 examination already referred to, "multiple deep abrasions" were found over the shin and in the popliteal space, which is in the back of the knee. And it must be remembered that the cast was bivalved on May 10, after which time no one claims that it caused any pressure. Accordingly it is a fair inference that the blebs and the bullae and the multiple deep abrasions in the front and back of the leg came from swelling and pressure within the cast. Such an inference finds support in the "Impression" noted on the St. Peter's Hospital chart after the examination of May 11, "(3) Impairment of collateral circulation by probable deep hematoma and subsequent swelling within the cast." The page on which this notation appears was inadvertently omitted from the record as it appears in appellant's appendix. However, it was made part of the appendix attached to respondents' brief. Incidentally, the report of this examination reads also: "Pt. was placed in a cast and circulatory difficulties were recognized after several days." However, originally this language seems to have been: "Pt. was placed in a cast and circulatory difficulties were unrecognized for several days." In explanation the doctor said that as he wrote the note he "felt it did not apply." The credibility of this statement was for jury determination, especially since the facts appearing in the Perth Amboy Hospital record may be considered by a jury as accurately described by the original comment.
Dr. Tuby's conclusion was that when the swelling was permitted to continue and to remain within the cast in spite of the warnings and symptoms, the resulting pressure within the cast caused general pressure on all the blood vessels, both arteries and veins in the area, so as to interfere with the circulation in the leg below the knee. He said also that in *596 particular there was compression of the anterior tibial artery, as well as venostasis, which is a static condition due to general pressure on the vessels. In describing the failure to bivalve the cast before May 10 he said:
"But they went too far, they waited too long, and there was what we call an anoxemia, or lack of oxygen to the cells in the foot and by the time the thing was finally loosened, and taken off, which was good treatment at that time, it was too late."
The theory of the defense at the trial was that the anterior tibial artery was injured when the fractures occurred and that gradually a thrombosis of this artery developed. Thereafter the collateral circulation held up for a while "but when this failed the leg didn't have enough nourishment, and that required amputation." In support of this theory reference is made to a finding at the first amputation that the posterior tibial artery was pulsating and that the anterior tibial artery was pulseless; and to a further finding at the second amputation and autopsical examination of the removed segment of the leg, that the anterior tibial artery was "threadlike from its popliteal origin to the upper portion of the anterior popliteal space where it lies in close relation to the site of the fracture."
The majority opinion finds that the causation claim of the respondents is contrary to the greater weight of the evidence, and in addition that their proof does not exclude the possibility that the cutting off of the circulation and resulting gangrene arose from an injury to the anterior tibial artery, which occurred at the time of the accident.
In my judgment the relation of cause and effect between the failure to bivalve the cast and the gangrene is so adequately demonstrated by the facts and by Dr. Tuby's testimony as to make the ultimate determination of the problem exclusively for the jury. Support for respondents' position is found in the defense testimony that if there was pressure within the cast evidence of it would appear on the front and back of the leg. As already pointed out, both the front and *597 the back of the leg showed deep abrasions and no defense witness offered any explanation for them.
With respect to the omission from the hypothetical question to Dr. Tuby of the facts relating to the pulseless and threadlike anterior tibial artery, and the failure to exclude the possibility of original injury to this artery as a cause of the gangrene, two matters must be noted. First, Dr. Tuby said that in particular the cast caused compression of this artery; and, second, that the diagnosis of the pathologist, Dr. Sylvan Moolten, after microscopic study, was "compression and obliteration of the anterior tibial artery." No diagnosis of thrombosis was made and when the doctor was asked if there was actual laceration or damage to the artery, the answer was:
"I can't answer that. I have no indicating (sic) here whether or not there was. I didn't describe it, so I didn't see it."
Under these circumstances the jury would be justified in finding some corroborative support for Dr. Tuby's assertion of cast compression of the anterior tibial artery. Furthermore, this artery is near the site of the fractures. It is a fair inference that the broken bones, especially the comminuted tibia, would be less able to withstand pressure within the cast than normal bones and, therefore, that the fractures facilitated the compression of the artery. Such an inference emphasizes the need for early bivalving of the cast when the symptoms of persistent pain appeared.
Thus, on all the facts, it seems to me that it was fairly for the jury to say whether the possibility of artery injury at the time of the accident was excluded. Certainty of causal relation is not the test; it is reasonable probability. In my judgment there was adequate evidence from which a jury could find that the reasonably probable cause of the gangrene was the negligence of the appellant in failing to bivalve or remove the cast prior to May 10, and particularly on May 7 or 8, 1950.
*598 Therefore, we should not substitute our conclusion for that of the jury. Their disposition of the matter should be regarded as final and their over-estimate of the value of the injury to the extent that the trial court found the verdicts to be excessive, should not alter that finality.