96 N.J. Super. 242 (1967)
232 A.2d 840
JOHANNA KAPLAN AND SIDNEY KAPLAN, PLAINTIFFS-APPELLANTS,
v.
KEITH HAINES, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 6, 1967.
Decided July 25, 1967.
*245 Before Judges GAULKIN, LEWIS and LABRECQUE.
Mr. Jerome S. Lieb argued the cause for appellants (Messrs. Harkavy & Lieb, attorneys).
Mr. William G. Bischoff argued the cause for respondent (Messrs. Taylor, Bischoff, Neutze & Williams, attorneys).
The opinion of the court was delivered by LEWIS, J.A.D.
This is a medical malpractice suit. Plaintiff Johanna Kaplan and her husband, Sidney Kaplan, who sued per quod, appeal from a judgment entered on a jury verdict of no cause for action in favor of defendant Keith Haines, an orthopedic surgeon. Their complaint was grounded on (a) defendant's alleged negligence in that he performed an unnecessary operation based upon an improper diagnosis and (b) the claim that he performed an unauthorized operation having failed to secure an informed consent.
It is here contended that the trial court committed reversible error (1) in refusing to charge certain requests, *246 (2) by the instructions that were given to the jury, and (3) by denying plaintiffs' motion for a new trial.

THE EVIDENCE
We begin with the factual background as related by Dr. Haines. He was first consulted by Mrs. Kaplan at his office on October 24, 1961; he received a history from her which disclosed that she was 44 years old and at age ten had injured her coccyx in a fall from which she fully recovered. In 1951 she fell off a chair and reinjured the coccyx and, since that time, she suffered from a dull ache in the lower buttocks area which failed to respond to medical treatment. The distress had been increasing and, on occasions, pain would radiate down her left leg to the great and second toes; the last such attack, which lasted two days, occurred approximately one week before her visit.
The doctor performed various physical examinations and tests and made a diagnosis that plaintiff's major problems were due to her age and a painful arthritis of a degenerative nature at the lumbosacral joint, and a painful coccyx which he considered a lesser problem. He prescribed medication and therapeutic treatment, and ordered X-rays to be taken.
When the patient returned to his office on November 3, 1961, the doctor discussed the X-rays with her. He reaffirmed his diagnosis of arthritis in the lumbosacral joint and opined that her primary trouble was at that location, and the discomfort in the coccyx area could be the result of referred pain originating in that joint. He suggested hospitalization and traction.
On November 10, 1961 plaintiff was admitted to the Cooper Hospital. She was placed in bilateral Russell traction which was discontinued on November 20. Since the traction therapy failed to relieve the radiating pain into the patient's leg, a myelogram and fluoroscopic examination were performed on November 22. They revealed "some minimal defects at the lumbosacral area" and mostly on the right side.
*247 The doctor testified that thereafter he had at least three conferences with the Kaplans, separately and together, lasting 15 or 20 minutes each, for a review and discussion of the matter. He explained to Mrs. Kaplan:
"* * * The things I have done to help you have not helped you. We have now arrived at the point where you have a choice to make. You have the choice of continuing with this pain, adjust your life to it with a brace or corset, it may be able to help it a little, but since the traction didn't help and since the traction immobilized the back, and since the effect of a brace is to immobilize the back, the brace doesn't offer much likelihood of helping either, and if you feel this pain is the type of a pain that you can live with and adjust your life to, well, then, that's what you ought to do. If you feel it is the kind of a pain that you just cannot consider enduring for day after day and month after month, then there is a fairly good chance that an operation would relieve at least a good part of this pain."
Although he did not recall the exact words used by plaintiff, he said "the thought that she expressed was that she just couldn't bring herself to look forward to a life with all this pain, and if an operation had a good chance of relieving it, she wanted the operation." The doctor said he told her husband:
"* * * the best way to do this is to put a bone graft in there and make these two vertebra grow together, that is make this last vertebra become part of the pelvic bone so this will stop the movement of this joint that is hurting, and if this joint doesn't move, it wouldn't hurt."
Plaintiffs consented to an operation which was performed on November 24. The recorded pre-operative diagnoses were primary "unstable lumbosacral joint" and secondary "post herniated disc." In the process of surgery it was found that the disc had not ruptured, but a "bulging" on the right side thereof was discovered which the doctor considered, because of its proximity to the nerves that pass through the vertebrae, could "well be responsible for some of the pain in her leg." The protruding area was removed and a spinal fusion of the last vertebra and the pelvic bone was consummated. The pathologist reported that a microscopic examination of *248 the excised substance revealed "Fibroelastic cartilage varying in staining quality suggesting degenerative change."
Plaintiff returned home from the hospital on December 10, 1961. The following January, however, she was again hospitalized for treatment of a staphylococcus infection which developed at the site of the incision. Defendant performed a second operation for removal of the original bone graft which had become involved with the infection. The patient was discharged from the hospital in April, and she continued visits to the doctor's office until August 1962. He testified that at the time of her last visit the wound had healed, "her back was nearly normal, she had some restriction in forward bending," but she reacted to other physical tests without restriction or pain and her mental condition "was much calmer."
Mrs. Kaplan's testimony was at variance with Dr. Haines' version of the facts in significant particulars. She stated that she was advised by the doctor, upon completion of his initial examination, that she had a bad disc involvement. After the ten days of traction, without relief, he told her:
"That the myelogram showed that there was a bad disc and this disc was pressing on a nerve and that he felt an immediate operation was necessary and if I didn't submit to an operation, I would become a wheel chair case."
The nature of the proposed surgery was described to her as a "disc operation." Plaintiff consulted her husband and the two of them, following a discussion of the matter with defendant, consented to an operation for the removal of a disc.
Plaintiff testified that she was told by the doctor, after the operation, that he had performed a laminectomy and a spinal fusion. Although unfamiliar with the technical terms used, she said, "Laminectomy I thought, was the removal of a disc for the correction of a herniated disc." She inquired of the doctor whether the coccyx had been removed and he said, "no, that he had run into trouble with the first *249 operation and he didn't have time to remove the coccyx, but he would operate on that the following week." The coccyx has never been removed.
In October 1962 plaintiff consulted Dr. James Nixon, an orthopedic surgeon in Philadelphia and, thereafter, she continued under his treatment.
Both sides produced medical evidence to support their respective contentions.
Dr. Philip Gilbert, a radiologist called as a witness for plaintiff, testified that the multiple-angle X-rays ordered by defendant in October 1961 were essentially negative and showed no gross abnormal bone or joint changes. They revealed, however, "a few minor spurs arising from the lateral margins * * * which indicate degenerative changes." He conceded that he could not deduce from such X-rays whether a disc was herniated. The witness also gave evidence that the interpretive notes of a staff member, with respect to said myelographic and fluoroscopic examinations made on November 22, disclosed:
"* * * there is a slight asymmetry at the nerve sleeve at the point space at the first sacral segment. There appears to be a slight elevation and incomplete filling of a nerve sleeve on the right side.

* * * * * * * *
* * * these findings together with the clinical history is suggestive of the presence of herniation of the inter vertebral disc at this level. However, the orentigon [roentgen] findings are by no means conclusive."
Dr. Nixon, when asked for his opinion as to whether the original diagnosis by Dr. Haines which led to the operation of November 24, 1961 was correct and whether the surgery performed was necessary, answered:
"One, the diagnosis, based on the assumed facts as presented, I feel was in error. Two, the surgical procedure as performed based on the diagnosis and based only on the diagnosis, would naturally be in error."
*250 The doctor also voiced the opinion that the mere fact that a patient recognizes that she is going to undergo a hazardous procedure "is not enough"; it is necessary "that the patient be informed as to the possible adverse effects * * * of the surgery." The causally related disability and injuries of plaintiff were described by Dr. Nixon as "* * * a limitation of motion in her back * * * restriction of her general activities * * * overwhelming concern with the consequences because of the past surgery * * * and what the future holds."
Four orthopedic surgeons, Drs. Warren Buendens, Stanley Brown, Matthew Mischinski and Luke Jordan, were called as witnesses by defendant. They testified, in effect, that Dr. Haines had offered plaintiff sufficient conservative therapy without anticipated relief, and that he had to go a step further and offer surgery if plaintiff was willing to accept it. Also, that if a patient suffers intractable pain, unrelieved by conservative measures, surgery may be justified in the absence of any objective findings. Each of defendant's expert witnesses, based upon the facts contained in the hypothetical questions submitted, expressed, in substance, the view that the diagnosis, operation, care and treatment of plaintiff by defendant, and his explanations to the patient in obtaining her consent to the operation, were in accord with the generally accepted standards of orthopedic practice and procedure.

THE ISSUES
As stated in plaintiffs' brief "they do not charge the defendant with improper technique in the performance of the operation." Thus the issues before the jury were narrow and uncomplicated and, as to the primary issues of liability, they were of such a nature that jurors could readily understand the simplicity of the two basic questions they had to resolve, i.e., (1) was defendant negligent in that he made a wrong diagnosis and performed an unnecessary operation, or (2) did he perform an unauthorized operation. These *251 issues were vigorously tried to the jury by experienced trial lawyers, throughout a two-weeks trial, and were emphasized by the presiding judge in his charge.
If the jurors believed Dr. Haines and accepted the testimony of the specialists who testified for the defense, which they had a right to do, they could have reasonably concluded from the evidence that the defendant did not perform an unnecessary operation based on a negligent diagnosis and that the surgery done was pursuant to an informed consent.

THE CHARGE
We have examined the requests which the trial court refused to submit to the jury and find that the meritorious portions thereof were in substance embraced in the charge that was given. It is fundamental that a party is not entitled to have the jury charged in words of his own choosing. Borowicz v. Hood, 87 N.J. Super. 418, 423 (App. Div. 1965), certification denied 45 N.J. 298 (1965). If the instructions clearly and correctly state the principles of law pertinent to the issues, they are sufficient. Abramsky v. Felderbaum, 81 N.J. Super. 1, 7 (App. Div. 1963), certification denied sub nom. Abramsky v. Esso Standard Oil Company, 41 N.J. 246 (1963).
The court would have erred had it instructed the jury, as requested, "that Dr. Haines told Mr. and Mrs. Kaplan that if she did not submit to immediate surgery, she would become a wheelchair case," and "Dr. Haines did not explain to them the details of the nature of the surgery nor any possible specific adverse results of the surgery." Plaintiffs' rendition of the facts was not to be accepted as a matter of law. The doctor had specifically denied that he used the words, "wheel chair case." What was explained to the Kaplans with respect to the proposed surgery was a disputed fact issue for resolution by the jury in reaching a determination as to whether the patient had given an informed consent to the operation that was performed.
*252 Plaintiffs' objections to the charge are fourfold.
(1) The jury's consideration of plaintiffs' testimony was improperly restricted. The jurors were told they must not attempt to determine the issue of consent "from any non-expert medical testimony produced during the course of the trial." This instruction was preceded by the court's comment that what Dr. Haines disclosed to his patient with respect to the proposed surgery "is a question of fact for your determination based on the non-expert evidence produced in connection therewith." Note the dichotomy rule discussed in Natanson v. Kline, 187 Kan. 186, 354 P.2d 670 (Sup. Ct. 1960).[1] Plaintiff's testimony was not restricted from jury consideration. Fragmentary segments of the charge, as previously noted, should not be taken out of context and the court's deliverance must be viewed in its totality. When so considered, it appears plain that the trial judge adequately and fairly delineated the relative functions of the expert and lay witnesses. No exceptions were taken to this phase of the court's charge and we perceive no basis for invoking the plain error rule. R.R. 1:5-3(c).
(2) The court prejudicially limited the issues to be considered. The challenged portion of the charge, which was not objected to at the trial, reads:
"Note, the plaintiff does not charge, nor allege that the technique involved in the performance of the operation, the method of its performance, the limitation of the operation to the site of the lumbosacral joint, nor the decision not to remove the coccyx were in any way negligent, nor does the plaintiff charge that the Staphylococcus infection was the result of any negligence on the part of the defendant; *253 methods or skill involved in the performance of the operation from which the infection resulted. Therefore, none of these facts are to be considered by you in determining the question of the issue of the liability and the damages involved in this case." (Emphasis supplied)
Plaintiffs concede they do not claim that the infection was the result of negligence in the performance of the operation, but argue it was plain error to tell the jury that it was not to consider "these facts" on the issue of damages. Although error was committed in this phase of the charge, it was not prejudicial error.
If the jury had reached the issue of damages, all of plaintiff's injuries such as infection, scar, pain and incapacity allegedly attributable to defendant's negligence would have been proper elements for consideration in arriving at a money award. The jury, however, returned a verdict of no cause for action in favor of defendant. Accordingly, where as here, significant issues of damages were submitted to the jury and it appears that the jury never reached those issues, errors in the charge as to damages are of no avail to plaintiffs on appeal. See Livesey v. Helbig, 87 N.J.L. 303, 305 (E. & A. 1915); Meisler v. Raiken Monument Works, 9 N.J. Misc. 664, 666, 154 A. 763, 764 (Sup. Ct. 1931). A new trial should not be ordered on harmless or nonprejudicial errors. Meszaros v. Gransamer, 23 N.J. 179, 184-186, 189-190 (1957). Accord, Cederlund v. Hub Loan Co., 88 N.J. Super. 238, 243 (App. Div. 1965).
(3) The instructions imposed a burden upon plaintiffs beyond that required by law. It is urged that the total effect of the charge was that plaintiffs could not receive damages from defendant unless they proved that his negligence was "the" proximate cause to the exclusion of any other cause. Three times throughout the court's instructions, which consumed 22 pages, the article "the" instead of "a" was used immediately preceding the words "proximate cause." These severed instances "must be read in light of the context and the whole charge." State v. Giberson, 99 N.J.L. 85, 93 (E. & A. 1923) and Vadurro v. Yellow Cab Co. of *254 Camden, 6 N.J. 102, 107 (1950). Clearly, it would be misleading error if the jury had been left with the impression that it must find the defendant's conduct to be "the sole cause" or "the dominant cause" of plaintiff's injuries.
Here, however, the trial judge properly defined proximate cause and clarified any doubt as to the intended applicable rule of law. For example, he instructed the jury:
"If you find from such expert testimony that Dr. Haines deviated from the standard requisite in making a diagnosis, and such deviation proximately contributed to the aggravation of plaintiff's pre-existing condition, she would be entitled to prevail upon her allegations concerning an improper diagnosis."
The plaintiff's proofs were projected to establish that the conditions about which she complained were attributable solely to defendant's fault. The jury was not instructed that the defendant could be held liable for his conduct "only" if that conduct was "the" proximate cause of plaintiff's injuries.
It is also contended that the statement in the charge that it was plaintiffs' burden to prove the alleged aggravation of a pre-existing condition was not due "to a cause with which the defendant was unconnected," put an undue burden on them, citing Callahan v. National Lead Co., 4 N.J. 150 (1950) and Swanson v. Wiesenfeld, 24 N.J. Super. 576 (App. Div. 1953). This court in Swanson, a malpractice action based upon alleged negligence of an orthopedic surgeon, reversed a judgment for plaintiff and followed the rationale enunciated in Callahan, quoting the following passage from the opinion in Stumpf v. Delaware, L. & W.R.R., Co., 76 N.J.L. 153, 158 (Sup. Ct. 1908):
"`* * * where it appears that the injuries were occasioned by one of two causes, for one of which the defendant is responsible, but not for the other, the plaintiff must fail if the evidence does not show that the injury was the result of the former cause. If under the testimony it is just as probable that it was caused by the one as the other, he cannot recover.'" 24 N.J. Super., at p. 588.
*255 The primary and basic question before the jury was whether the conduct of the defendant caused harm to the plaintiffs. The acid test is whether the jury was misled by the instructions given. Middleton v. Public Service Co-ordinated Transport, 131 N.J.L. 322, 323 (E. & A. 1944); Borowicz v. Hood, supra, 87 N.J. Super., at p. 424. In the factual setting of this case we conclude that the charge on proximate cause and burden of proof, as given, was not likely to have significantly impeded an intelligent resolution of the issues under jury consideration.
(4) Erroneous instructions were given on matters having no bearing on the case at bar. The attack goes to the propriety of the charge in a malpractice case where, as here, it is alleged that there was an uninformed consent to the operation. In essence, the argument runs that plaintiffs carried their burden of proof if the facts support a conclusion that defendant failed to disclose or improperly disclosed the dangers, and, therefore, it was error to charge the jury that a verdict should not be returned in favor of the Kaplans "if you find from the evidence that Mrs. Kaplan fully appreciated the danger involved in the operative proceedings."
The trial judge and counsel had before them for consideration in advance of the charge a copy of the first opinion in Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093 (Sup. Ct. 1960). It is admitted in plaintiffs' brief that the relevant section of the charge was correct "as an abstract statement of law and is taken verbatim from the landmark case of Natanson * * *," but it is maintained "that does not justify the giving of inapplicable instructions." It should be noted that the excerpt under attack was taken from a lengthy explanation in the charge in this case as to what is meant by an "informed consent" which included the statement:
"* * * The standard that must be followed by an orthopedic specialist in performing this duty is that he must make such disclosure as *256 a reasonable orthopedic specialist would make faced with the same or similar circumstances.
A physician violates this duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent, and which a reasonable orthopedic specialist would have disclosed and which are within his knowledge. Likewise, the surgeon may not minimize the known dangers of an operation in order to induce a patient's consent.
However, the law does not require a physician to disclose to a patient all the details of the operation, nor all the possible ill effects which could conceivably follow a proposed operation, no matter how remote, since this may well result in alarming a patient who is already unduly apprehensive and who may, as a result, refuse to undergo surgery in which there is, in fact, only a minimal risk."
Note the second opinion in the Natanson case, supra. Accord, Salgo v. Leland Stanford Jr. University Bd. of Trustees, 154 Cal. App.2d 560, 317 P.2d 170 (D. Ct. App. 1957). But see Mitchell v. Robinson, 334 S.W.2d 11, 79 A.L.R.2d 1017 (Mo. Sup. Ct. 1960)[2]; Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (Sup. Ct. 1966).
There are at least three cases, Russell v. Jackson, 37 Wash.2d 66, 221 P.2d 516 (Sup. Ct. 1950), Wheeler v. Barker, 92 Cal. App.2d 776, 208 P.2d 68 (D. Ct. App. 1949), and DiCenzo v. Berg, 340 Pa. 305, 16 A.2d 15 (Sup. Ct. 1940), where the courts found no liability, relying on the fact "that the patients knew of the general scope of the operations, although in each it appears that he or she did not know of the actual consequences." McCoid, "A Reappraisal of Liability for Unauthorized Medical Treatment," 41 Minn. L. Rev. 381, 411 (1957). And see Dr. Lund's article, "The Doctor, the Patient, and the Truth," 19 Ten. L. Rev. 344 (1946), wherein he makes the point that the disclosure of too many details may have an adverse effect upon the patient and, accordingly, the physician or *257 surgeon should have a broad area of discretion since his treatment must be concerned with the patient's whole personality. Accord, Shetter v. Rochelle, 2 Ariz. App. 358, 409 P.2d 74, opinion modified 2 Ariz. App. 607, 411 P.2d 45 (Ct. App. 1965)
As stated in Barnett v. Bachrach, 34 A.2d 626, 629 (D.C. Mun. Ct. App. 1943): "The law does not insist that a surgeon shall perform every operation according to plans and specifications approved in advance by the patient, and carefully tucked away in his office-safe for courtroom purposes." See also, Kennedy v. Parrott, 243 N.C. 355, 90 S.E.2d 754, 56 A.L.R.2d 686, 692-693 (Sup. Ct. 1956), and Annotation, "Liability of physician or surgeon for extending operation or treatment beyond that expressly authorized," 56 A.L.R.2d 695 (1957).
There is no definitive yardstick by which there can be an exact determination that a surgeon has surpassed the consent of the patient. The authorities, however, are in general agreement that the nature and extent of the disclosure, essential to an informed consent, depends upon the medical problem as well as the patient. Plaintiff has the burden to prove what a reasonable medical practitioner of the same school and same or similar community, under the same or similar circumstances, would have disclosed to his patient and the issue is one for the jury where, as in the case sub judice, a fact issue is raised upon conflicting testimony as to whether the physician made an adequate disclosure. See Scott v. Wilson, 396 S.W.2d 532 (Tex. Ct. Civ. App. 1965), affirmed 412 S.W.2d 299 (Tex. Sup. Ct. 1967) and Ditlow v. Kaplan, 181 So.2d 226 (Fla. D. Ct. App. 1965).
The facts in the case at bar are unlike those in Natanson v. Kline, supra. There, Dr. Kline made no disclosure and the nature of the treatment was relatively new and relatively dangerous. Here, the proposed surgery was not of an uncommon type and the evidence does not indicate that such an operation should be characterized as extremely hazardous. *258 It is uncontroverted that defendant conferred with one or both of the plaintiffs on three occasions for the purpose of considering his medical findings and recommendations. Plaintiff testified that the pain she was suffering at that time was "unbearable," she recognized that the procedure suggested by Dr. Haines was "a serious operation," and before giving her consent, she conferred with her husband, a practicing lawyer, who discussed the proposed operation with the doctor before consenting thereto. It is also significant that plaintiff was no stranger to hospitals and surgery; she had previously undergone an appendectomy, hysterectomy, hemorrhoidectomy, and operations for the removal of kidney stones and her gall bladder.
The operation in controversy was limited to the authorized lumbosacral joint of the anatomy that was under treatment. Moreover, the record is void of evidence that any tests or examinations, other than surgery, would have revealed the precise cause of patient's physical difficulties. Cf. Bennan v. Parsonnet, 83 N.J.L. 20 (Sup. Ct. 1912), which treats with the implied authority of the surgeon as the representative pro hac vice of his patient who should receive the full benefit of the doctor's professional judgment and skill during the employment of anesthesia which renders impossible emergent consultation with the patient.
We cannot say, in the context of the proofs before the trial court, that its charge was erroneous in permitting the jury to take into consideration the evidence that "Mrs. Kaplan fully appreciated the dangers involved in the operative procedures." In logic and fairness her appreciation, whatever the source, of the proposed surgery and its inherent risks should be a factor for the jury to consider in determining whether the signed consent to the operation was in reality an informed consent.

THE DENIAL OF A NEW TRIAL
It is basic that on an application for a new trial the trial court may not substitute its judgment for *259 that of the jury. As stated in Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962), "If reasonable minds might accept the evidence as adequate to support the jury verdict, it cannot be disturbed by the trial court." The jury determination should be set aside only when and if it "clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion." R.R. 4:61-1. The authority of the appellate court in reviewing the order of a trial judge in denying or granting such a motion is more restricted, and the judge's action will not be disturbed unless it clearly and unequivocally appears that there has been an abuse of discretion on his part. Hartpence v. Grouleff, 15 N.J. 545, 549 (1954); Hickman v. Pace, 82 N.J. Super. 483, 488 (App. Div. 1964); Varlaro v. Schultz, 82 N.J. Super. 142, 153 (App. Div. 1964); Kulbacki v. Sobchinsky, supra, 38 N.J., at p. 446.
The trial judge was convinced that the verdict was supportable by the evidence and that the charge rendered on negligence, proximate cause and informed consent was sufficiently clear and comprehensive, and that the jury could not reasonably have been confused. Our study of the record leads us to the same conclusion.
Judgment affirmed.
LABRECQUE, J.A.D. (dissenting).
I find myself unable to concur in the conclusions of my colleagues that certain deficiencies in the charge do not call for reversal of the judgment below.
The facts are fully set forth in the majority opinion and need not be repeated here. I am fully in accord with the conclusion reached therein that the trial judge properly instructed the jury on the issue of whether the consent of Mrs. Kaplan to the operation was an informed one. However, I would hold that certain other portions of the charge involved prejudicial error and compel a reversal.
As noted in the opinion of the majority, the jury was instructed that it was not to consider certain facts  including development of the staphylococcus infection  on the *260 question of damages. My colleagues, while of the opinion that error was committed in this phase of the charge, arrive at the conclusion that it was not prejudicial in view of the adverse finding of the jury on the issue of liability. I would hold it to be prejudicial, when considered in connection with other portions of the charge to which reference is made infra. See State v. Orecchio, 16 N.J. 125, 129 (1954); Schueler v. Strelinger, 43 N.J. 330, 348 (1964); Wimberly v. City of Paterson, 75 N.J. Super. 584, 612 (App. Div. 1962), certif. denied 38 N.J. 340 (1962).
The jury was instructed that it was incumbent upon plaintiffs to establish that the defendant's negligence was the proximate cause of Mrs. Kaplan's post-operation disability, to the exclusion of causes with which defendant was disconnected. By this portion of the charge plaintiffs were required to shoulder a burden which the law did not impose upon them. While the majority opinion holds that "it would be misleading error if the jury had been left with the impression that it must find the defendant's conduct to be `the sole cause' or the `dominant cause' of plaintiff's injuries," it concludes that the use of the words "proximately contributed" in other portions of the charge cures any possibility of error. I would hold that if the charge as given did not directly compel the view that plaintiffs were required to establish that defendant's negligence was the sole cause of the unfortunate train of events that ensued, it possessed such a clear capacity to mislead as, when considered in connection with other portions of the charge, to call for reversal. Wimberly v. City of Paterson, supra, at p. 612.
In a negligence case, our law attaches liability not only to the dominant cause but to any cause which constitutes at any event a substantial factor in bringing about the injury. Melone v. Jersey Central Power & Light Co., 30 N.J. Super. 95, 105 (App. Div. 1954), affirmed 18 N.J. 163 (1955). Accord, Dalton v. Gesser, 72 N.J. Super. 100, 111 (App. Div. 1962). See also generally Restatement (Second), Torts § 454, comment (b) (1965). This was never made *261 clear to the jury. On the contrary, during the initial portion of the charge, it was instructed that in order to recover, plaintiffs were required to establish (1) negligence on the part of defendant, and (2) "that such negligence was the proximate cause of the alleged aggravation of the pre-existing condition of the plaintiff, Mrs. Kaplan * * *." Immediately thereafter the jury was instructed that:
"Proximate cause is defined as the efficient cause, the one that necessarily sets the other causes in operation. It is the act or omission which directly brings about the happening complained of in the absence of which such happening would not have occurred." (Emphasis added)
Two pages later the jury was charged:
"If you find from such expert testimony that Dr. Haines deviated from the standard requisite in making a diagnosis, and such deviation proximately contributed to the aggravation of the plaintiff's pre-existing condition, she would be entitled to prevail upon her allegations concerning an improper diagnosis." (Emphasis added)
And:
"[P]rovided this failure to the plaintiff proximately contributed to the alleged aggravated condition of the plaintiff's pre-existing condition." (Emphasis added)
Later, however, the jury was instructed that plaintiffs were required to establish that:
"[T]he alleged aggravation of Mrs. Kaplan's pre-existing condition was proximately caused by the negligence of the defendant before she would be entitled to recover at your hands, for if you find that the alleged aggravation was not proximately caused by the negligence of the defendant then the plaintiffs would not be entitled to a verdict in your hands." (Emphasis added)
Still later, it was instructed that plaintiffs could recover if:
"[T]he said negligence proximately contributed to the aggravation of the plaintiff's pre-existing condition." (Emphasis added)
*262 Toward the end of the charge, the court reverted to its original wording:
"Accordingly, to recover for the aggravation of a pre-existing condition it is incumbent upon the plaintiff to prove by the preponderance of the evidence that the negligence of the defendant was the proximate and efficient cause of the aggravation of such pre-existing condition * * *." (Emphasis added)
It is difficult to conceive from the above how the jury could have avoided the impression that for Mrs. Kaplan to recover she was required to establish that defendant's negligence was the sole cause of the disability from which she was suffering. This impression was emphasized by the court's requirement that plaintiffs exclude all causes with which defendant was not connected. The latter requirement would have been proper as applicable to a single injury which could have resulted from one of two possible causes  such as the amputation of the gangrenous leg involved in Swanson v. Wiesenfeld, 24 N.J. Super. 576 (App. Div. 1953), cited in the opinion of the majority. But if the negligence of a defendant, operating upon the body of a plaintiff having a previous condition of illness or injury (here, allegedly, an unstable lumbosacral joint with painful coccyx), produces a causally resultant condition worse than it would have been if the plaintiff had been in perfect health before the accident, the plaintiff may nevertheless recover for her total existing condition consequent upon the negligent act in question. Dalton v. Gesser, supra, 72 N.J. Super., at p. 111. And if a defendant's negligence combines with any other independent intervening cause (here a staphylococcus germ) to bring about an injury to plaintiff, he is liable though his negligence was not the sole negligence or the sole proximate cause, and although his negligence without such other independent cause would not have produced that injury. Robbins v. Thies, 117 N.J.L. 389, 394 (E. & A. 1937); Rappaport v. Nichols, 31 N.J. 188, 203-205 (1959); Peer v. City of Newark, 71 N.J. Super. 12, 28 (App. Div. 1961), certif. denied 36 N.J. 300 (1962).
*263 Wholly aside from the foregoing, use of the words "proximately contributed" without any explanation as to what they meant as contra-distinguished from the words "the proximate cause" or "proximately caused" could have done no more than leave the jury in doubt. Girardin v. New York & L.B.R.R. Co., 135 N.J.L. 135, 138 (E. & A. 1947). From the fact that one of the items of damage claimed was the aggravation of Mrs. Kaplan's back condition, it is clear that the jury never could have determined that defendant's negligence was the proximate cause of her disability in that area, although it could have found that it was a contributing cause thereof. Here there was no instruction on contributory causation which would justify the conclusion that, upon consideration of the charge as a whole, the error was harmless.
The capacity for prejudicial error of this portion of the charge is further demonstrated when it is considered in the context of the court's instruction in the initial portion of the charge, that for the plaintiffs to recover they were required to establish that the negligence of defendant had brought about an aggravation of Mrs. Kaplan's pre-existing condition. The effect of this was to confine the plaintiffs' case to the theory of aggravation and to deny recovery in the event they were unable to establish that the condition of the lower spine from which she was suffering prior thereto was worsened as the result of the operation. As is pointed out in the underlined portions of the charge quoted above, this additional burden on plaintiffs was repeated throughout the charge. The fact that the jury was later instructed as to additional items of damage which would have been recoverable did not cure the error inherent in the requirement that plaintiffs prove an aggravation before they could recover at all.
Actually, plaintiffs' claim to recovery was neither dependent upon nor restricted to the alleged aggravation of Mrs. Kaplan's back condition as it pre-existed the operation. In addition to the pain, suffering, disability and inconvenience attendant upon the first operation (involving removal of the *264 lamina and part of a disc, and an attempted bone graft), Mrs. Kaplan was compelled to undergo a second operation by defendant and was left with a permanent indented scar in her back. Since then she had been under continuous medical treatment and had allegedly been hospitalized nine times. Mr. Kaplan's out-of-pocket expenses for his wife's care, stipulated to be reasonable, amounted to $15,179.69.
I would accordingly hold that the judgment should be reversed and the case remanded for a new trial.
NOTES
[1] 354 P.2d, at p. 673. "Whether or not a physician has advised his patient of the inherent risks and hazards in a proposed form of treatment is a question of fact concerning which lay witnesses are competent to testify, and the establishment of such fact is not dependent upon expert medical testimony. It is only when the facts concerning the actual disclosures made to the patient are ascertained, or ascertainable by the trier of the facts, that the expert testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances."
[2] A review of the problems presented by the Natanson, Salgo and Mitchell decisions is made in Note, "Duty of Doctor to Inform Patient of Risks of Treatment: Battery or Negligence?," 34 So. Cal. L. Rev. 217 (1961). See also Powell, "Consent To Operative Procedures," 21 Maryland L. Rev. 189 (1961), and McCoid, "The Care Required of Medical Practitioners," 12 Vand. L. Rev. 549, 586 (1959).