Terry DIAS and Antoinette Dias,
Plaintiffs-Appellants,

v.

DAISY–HEDDON, a Division of Victor
Comptometer Corporation, Wayne J.
and Viola M. Odiorne, Thomas Burac-
zewski, and David Hanson, Defendants-
Appellees.

No. 3–676A150.

Court of Appeals of Indiana,
Third District.

May 30, 1979.

Rehearing Denied July 9, 1979.

Robert F. Gonderman, South Bend, for plaintiffs-appellants.

James H. Pankow, South Bend, for defendants-appellees.

HOFFMAN, Judge.

Plaintiffs-appellants Terry Dias and Antoinette Dias (Diases) appeal from a judgment rendered on the jury's verdict finding for defendant-appellee Daisy-Heddon on the Diases complaint which alleged that a BB gun manufactured by Daisy-Heddon was defective and unreasonably dangerous.

The evidence most favorable to the appellee Daisy-Heddon is as follows:

In December of 1970 defendant Thomas Buraczewski purchased a 30/30 BB gun, manufactured by co-defendant Daisy-Heddon, at Michiana Wholesale, Inc. as a Christmas present for his nine-year-old stepbrother, David Hanson. Buraczewski took sole responsibility for teaching David to use the BB gun and to supervise his use of the gun. Neither of David's parents, Viola and Wayne Odiorne, were familiar with the operation of the BB gun.

The evidence further shows that neither Buraczewski nor David remembered reading the unloading instructions or warnings, that Buraczewski never attempted to unload the gun or teach David to do so and that the gun was usually put away in a loaded condition if all the BBs had not been fired. Buraczewski and both of David's parents told David to always treat the gun as if it were loaded and to never point the gun at any person or living thing.

On August 17, 1971, David was playing cops and robbers with the neighborhood children when he was asked to go home and get his BB gun. He returned home and his mother reluctantly permitted him to take the gun provided he unload it. David testified that he attempted to unload it, though he had not read the unloading instructions, and that he shot it into the ground two or three times. The next morning he took the gun out again to play with his friends. The evidence most favorable to the appellee shows that the BB gun was cocked by a friend of David's in David's presence and that David may have also cocked the gun.

David aimed and fired the BB gun hitting Terry Dias in the eye, which injury necessitated the removal of the eye.

The Diases filed a complaint against David Hanson, Wayne and Viola Odiorne, Thomas Buraczewski, Daisy-Heddon and Michiana Wholesale, Inc. Michiana Wholesale was dismissed as a party before trial. Also prior to trial, on October 16, 1974, the Diases entered into a loan receipt agreement with David Hanson, his father and mother, and Thomas Buraczewski which agreement provided to the Diases a "loan" of $21,000 which was repayable to the agreeing defendants if the recovery from Daisy-Heddon was more than said amount. The agreement limited the liability of the agreeing defendants to $21,000. If the judgment obtained was less than $21,000, the Diases agreed to execute against Daisy-Heddon and pay 50% of the amount collected to the agreeing defendants.

At trial, the agreeing defendants remained party to the lawsuit, participating in opening statements, instructions offered to the court, cross-examination of witnesses and closing argument. The jury's verdict

found against David Hanson and Viola Odiorne upon the Diases' complaint which alleged that said parties were negligent, but the jury awarded zero damages to the Diases. The jury's verdict found for Daisy-Heddon upon the Diases' complaint which alleged that Daisy-Heddon, under the theory of strict liability, was liable for the injuries sustained by Terry Dias because the BB gun was in a defective condition and unreasonably dangerous when the gun left Daisy-Heddon's possession.

The appellants argue the following issues in this appeal:

(1) that the court erred in refusing to admit into evidence the plaintiffs' exhibits consisting of another BB gun and the instructions thereto for the purpose of showing that an alternative design was safer and easier to unload;

(2) that Daisy-Heddon's instruction given by the court was an incorrect statement of the law and that it took the essential issue of the case away from the jury; and

(3) that the court erred in refusing to allow the plaintiffs to introduce the entire loan receipt agreement into evidence.

### I.

The doctrine of strict liability, as set forth in Section 402A of the Restatement of Torts (2d) has been adopted as the law in Indiana. *Ayr-Way Stores, Inc. et al. v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335; *Perfection Paint v. Konduris* (1970), 147 Ind.App. 106, 258 N.E.2d 681; *Cornette v. Searjeant Metal Prdcts.* (1970), 147 Ind. App. 46, 258 N.E.2d 652. Section 402A imposes liability upon "[o]ne who sells any product in a defective condition unreasonably dangerous to the user. . . ."

A product may be defective because of manufacturing flaws, defective design, or failure to discharge a duty to warn or instruct with respect to potential dangers in the use of the product. *Nissen Trampoline Co. v. Terre Haute First Nat. Bk.* (1975), Ind.App., 332 N.E.2d 820; *Burton v. L. O.*

*Smith Foundry Products Co.* (7th Cir., 1976), 529 F.2d 108. In the case at bar it is argued that the model 30/30 BB gun was defectively designed in that its unloading mechanism was inadequate and unreasonably dangerous, and it is also alleged that the instructions for the gun failed to adequately warn of the dangers associated therewith.

Guy Braugher, the designer of the model 30/30 testified that the gun had been manufactured by Daisy since 1961. The 30/30 model was patterned after the 1894 Winchester rifle; it was a side-loading BB gun as opposed to being barrel-loading. The evidence shows that a yellow sticker attached to the cocking lever read as follows:

"IMPORTANT NOTICE

"The literature enclosed in the package with this Daisy product contains important information. Read it carefully before using your Daisy gun. . . ."

The instructions entitled, "OPERATION MANUAL Be safe—read before loading or shooting," contained this warning in bold print, "Always handle a gun as if it were loaded." The instructions further advised that the gun should not be pointed toward any living thing and that the gun was only to be cocked in anticipation of firing the gun. At two different places the instructions warn that "[y]ou can't tell by looking if your gun is loaded so always treat it as if it were loaded." The unloading instructions read as follows:

"TO UNLOAD, make certain your gun is not cocked by firing in a safe direction. "Slide the feed arm forward with the muzzle up and shake B • Bs back into the reserve magazine. Then open the loading gate and shake B • Bs from the reserve magazine. To make certain the gun is empty, fire it 10 or 15 times in a safe direction.

"IMPORTANT: Since it is impossible to actually see into the mechanism of this gun to be certain it is unloaded, always treat it as though it IS LOADED."

The evidence was conflicting as to whether all the BBs could be removed by opening

the loading gate and shaking the BBs from the reserve magazine. But the testimony of all parties was that if all the steps of the instructions for unloading were followed, i. e., if the gun was fired 10 or 15 times in a safe direction, then the gun would definitely be unloaded.

Under the doctrine of strict liability an essential element of proof is that the defective condition of the product causes plaintiff's harm. *Ayr-Way Stores, Inc. et al. v. Chitwood, supra*; *Nissen Trampoline Co. v. Terre Haute First Nat. Bk., supra*. That the product was defective or unreasonably dangerous is a prerequisite to proximate cause under the strict liability rule. *See*: *Procter & Gamble Manufacturing Co. v. Langley* (Tex.Civ.App.1967), 422 S.W.2d 773, at 779. In *Gilbert v. Stone City Const. Co., Inc.* (1976), Ind.App., 357 N.E.2d 738, the court cites Section 402A, Comment i to define the standard:

" '. . . The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. . . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. . . .' " Cited in *Gilbert, supra*, at 743.

Proximate cause is commonly defined as "that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Johnson v. Bender* (1977), Ind.App., 369 N.E.2d 936, at 939.

A plaintiff may be defeated in his claim by showing that (1) the injuries were caused *solely* by his own conduct, in whatever form, (2) he voluntarily and unreasonably proceeded to encounter a known risk arising out of the defect [assumed or incurred risk] or (3) he misused the product in question. *Gregory v. White Truck and Equipment Co., Inc.* (1975), 163 Ind.App. 240, at 253, 323 N.E.2d 280, at 287–288.

And Section 402A, Comment j provides in pertinent part:

"Directions or warnings. In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warnings, on the container, as to its use. . . .

\* \* \* \* \* \*

"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

In Indiana the law supplies a presumption that an adequate warning would have been read and heeded. *Ortho Pharmaceutical Corp. v. Chapman* (1979), Ind.App., 388 N.E.2d 541; *Nissen Trampoline Co. v. Terre Haute First Nat. Bk., supra*; *Gregory v. White Truck and Equipment Co., Inc., supra*.

The question as to whether the BB gun was dangerously defective is one for the jury. *Gilbert, supra*. And if the gun was defective, it was also for the jury to determine whether the defective condition of the gun was the proximate cause of Dias's injury. *St. Joseph Bank & Trust Co. v. Wackenhut Corp.* (1976), Ind.App., 352 N.E.2d 842, at 845.

As the jury returned only a general verdict we cannot determine the exact basis of its decision, but we do know it found negligence on the part of David Hanson and Viola Odiorne. As to the judgment for Daisy-Heddon, the jury either found that the BB gun was not in a defective condition unreasonably dangerous or that it was defective but that said defect was not the proximate cause of the injury to Dias.

The jury could well have decided under the evidence that if the instructions and warnings for handling the gun had been followed the accident would not have happened, i. e., if the gun had been fired 10 or 15 times in a safe direction, if the gun had not been cocked, and if the gun had not been aimed and fired at a living person. The intended purpose of a BB gun obvious-

ly does not include pointing and firing a gun (especially one that had not been unloaded according to instructions) at another person. There is evidence that the model 30/30 was not dangerous for its intended use and that the negligence of the user was the proximate cause of the plaintiff's injury. *Zollman v. Symington Wayne Corporation* (7th Cir., 1971), 438 F.2d 28.

It is the contention of Diases that the requirement that the gun be fired 10 or 15 times in a safe direction was not an adequate or safe method of unloading the BB gun. To support this contention appellants sought to introduce into evidence another BB gun, model 102, manufactured by Daisy-Heddon, which was a barrel-loading gun. Appellants argue that the alternative design is admissible to show the "state of the art" and to show that Daisy-Heddon knew of a safer unloading method.

In their offer to prove, the Diases stated that Professor Brach would have testified that the design of the model 102 BB gun featured a shot tube which could be removed from the barrel of the gun and without which the gun could not be fired. Thus, with the model 102 the user could readily ascertain whether or not the gun was unloaded. Brach would also have testified that the model 30/30 could have been modified to use the shot tube, retaining the same appearance as the 1894 Winchester rifle but not using the side-loading mechanism.

At trial Daisy-Heddon objected to the admission of the model 102 BB gun and its instructions stating that whether or not a barrel-loading BB gun could be unloaded in accordance with its instructions was of no assistance and had absolutely no relevance to the issue of whether the gun in question, with a different loading mechanism, could or could not be unloaded in accordance with a different set of instructions.

The court sustained Daisy's objection on the basis that the design used was a choice Daisy had a right to make, that while you could admittedly retain the same appearance of the side-loading you could not use the side load on the modified gun that Diases wished to present. The court stated

that the plaintiffs were taking a completely different type of gun which was built in an entirely different way trying to show how they should have built the BB gun. The court said that the two guns could not be compared.

In *Zahora v. Harnischfeger Corporation* (7th Cir., 1968), 404 F.2d 172, at 175–176, the court stated:

"In measuring the duty of a manufacturer, it is clear there is no duty to produce an accident or fool-proof product; however, it is equally clear the manufacturer is legally bound to design and build a product which is reasonably fit and safe for the purpose for which it is intended."

Neither is a 'manufacturer an insurer that its product is incapable of producing injury. *Collins v. Ridge Tool Company* (7th Cir., 1975), 520 F.2d 591, at 594; *J. I. Case Co. v. Sandefur* (1964), 245 Ind. 213, at 222, 197 N.E.2d 519, at 523.

■ It appears that evidence of alternative designs may be relevant to the question of whether the design in question is unreasonably dangerous. *See: Mahoney v. Roper-Wright Manufacturing Company, Inc.* (7th Cir., 1973), 490 F.2d 229. And in *Sutkowski v. Universal Marion Corporation* (1972), 5 Ill.App.3d 313, 281 N.E.2d 749, the Illinois Court of Appeals held that design alternatives are appropriately considered where liability is predicated upon strict tort liability.

One of the most recent cases in Indiana related to this issue is *Walters v. Kellam & Foley* (1977), Ind.App., 360 N.E.2d 199. In *Walters* this Court reversed the trial court's exclusion of evidence designated as "custom" and alternative design evidence. While the Court noted that the admissibility of such evidence is a determination which lies within the discretion of the court, it noted that the evidence of custom and alternative design was within the bounds of Indiana law relating to hypothetical questions and that it should have been admitted.

■ And in *Ortho Pharmaceutical Corp. v. Chapman, supra,* a decision concerning the duty of manufacturers of ethical drugs

to warn users of risks attendant to taking the drugs, this Court stated that manufacturers are charged with the knowledge of risks known to science during the period in which the plaintiff was using the product. By analogy, manufacturers in other areas of product liability are charged with the knowledge of experts in their fields of interest. We think this is the better rule. Of course, whether or not proffered testimony and evidence is truly relevant to the product at hand or merely remotely so will remain a question within the discretion of the court.

■ While the evidence excluded by the trial court should have been admitted, the failure to do so upon the facts and circumstances of the case at bar was not reversible error. Even though the model 102 BB gun itself was excluded, there was evidence before the jury as to alternative unloading procedures. Both Buraczewski and Hintz (friend of David Hanson) testified that they had a BB gun which loaded and unloaded through the barrel. Baugher discussed the design selection process and various modifications that were considered. Brach testified as to various modifications he made to the model 30/30 to show how the gun could be made more readily unloadable without the necessity of firing the gun 10 or 15 times in a safe direction. The jury was told, through the questioning of witnesses and the opening and closing arguments, several times, that barrel-loading BB guns are more common, that plaintiffs' theory is that they are also safer to unload and that the plaintiffs based their case upon the premise that the requirement in the unloading instructions that the gun be fired 10 or 15 times in a safe direction was a defective design and an unreasonably dangerous one. This theory was clearly presented to the jury and it was for the jury to determine whether or not the design of the model 30/30, considered in the context of its instructions and warnings, was unreasonably dangerous. As stated earlier, under the evidence presented at trial the jury could well have decided that as to design, the BB gun in the careful hands of a consumer was not dangerous for its intend-

ed use. *Downey v. Moore's Time-Saving Equipment, Inc.* (7th Cir., 1970), 432 F.2d 1088, at 1091. It cannot be said as a matter of law that Daisy-Heddon's design of or instructions for the model 30/30 were the proximate cause of Dias's injury. *Kroger Co. v. Haun* (1978), Ind.App., 379 N.E.2d 1004, at 1007.

## II.

■ The court gave Daisy-Heddon's instruction as modified:

"The fact that a product may, by improper use, cause injury, does not make the product unreasonably dangerous. A BB gun in and of itself is not an unreasonably dangerous product."

Appellants objected to the giving of this instruction at trial stating that the instruction "tells the jury that the BB gun is not an unreasonably dangerous product under any circumstances which is a misstatement of the law."

Appellants are twisting the plain meaning of this instruction. The instruction says that *a* BB gun (not this BB gun) *in and of itself* is not an unreasonably dangerous product. Contrary to appellants' allegation that the instruction tells the jury that the gun is not *under any circumstances* unreasonably dangerous, "in and of itself" means the absence of circumstances, i. e., the gun by itself or "inherently." "Unreasonably dangerous" is defined in another instruction given by the court as "unsafe for a use that is reasonably forseeable to an extent beyond that which would be contemplated by the ordinary consumer, with the ordinary knowledge common to the community as to its characteristics." This definition has been given as a definition of what a defective product is. Thus, the instruction appellants object to merely states that a BB gun is not inherently defective. Other instructions advised the jury that a defective condition may refer to the design of the product, the manufacture of the product, or to the failure to give adequate warning or instruction to the ultimate user. The instructions accurately state the law in Indi-

ana as to products liability; the appellants argument is without merit.

## III.

Appellants argue that the court erred in refusing to admit the loan receipt agreement into evidence. The court refused to admit the agreement because it contained several self-serving statements concerning liability and indemnification rights.

After the court informed the parties that it would not permit the loan receipt agreement to be admitted, the parties agreed to work out a stipulation as to the pertinent facts concerning the loan receipt agreement. Included therein were the terms of the agreement and the Odiornes' insurance limit of $25,000 and the settlement amount of $21,000.[1]

As a general rule, loan receipt agreements have been expressly approved for use in Indiana. *Burkett v. Crulo Trucking Company* (1976), Ind.App., 355 N.E.2d 253; *City of Bloomington v. Holt* (1977), Ind. App., 361 N.E.2d 1211; *N. I. P. S. Co. v. Otis* (1969), 145 Ind.App. 159, 250 N.E.2d 378. In *City of Bloomington,* the Court stated that while this settlement device has been subjected to criticism, it should remain valid for use in Indiana. The major problem is how the agreement should be presented to the jury.

In *Burkett, supra,* 260 of 355 N.E.2d, the Court discussed the problem at hand:[2]

". . . [T]he loan receipt agreement may be drafted with admissions and accusations so damning to the non-participating co-defendant that the co-defendant is placed in a dilemma. He must choose to suffer in silence damaging conduct at trial by the co-defendant participating in

the agreement, or he must choose to explain that conduct to the trier of fact by offering into evidence the agreement with its statements calculated to frame the offering party in the worst possible light."

The court in *Burkett* did not resolve the problem but merely brought it up to "discourage potential misuse of loan receipt agreement in the future."

It is well settled under Indiana law that a party cannot manufacture evidence in its favor, *Town of Highland v. Powell* (1976), Ind.App., 341 N.E.2d 804, at 810, and that " '[s]elf-serving statements or declarations by the party or his attorney not under oath cannot constitute any evidence of the facts they allege.' " *Hardiman v. Hardiman* (1972), 152 Ind.App. 675, at 680, 284 N.E.2d 820, at 823, *quoting from Wabash Smelting, Inc. v. Murphy* (1962), 134 Ind.App. 198, at 206, 186 N.E.2d 586, at 590 (overruled on other grounds).

Appellants argue that under the best evidence rule the loan receipt agreement is the best evidence of its terms. But there appears to be a conflict between the two rules in this instance which is resolved by this discussion at 2 *Jones on Evidence*, § 7.4, p. 96, on the distinction between proof of contents and proof of facts asserted in writings:

"While the instrument itself is the best evidence, and, if available, the only evidence of what it contains, it often happens that the recitals of the instrument are hearsay, such as the narration of events in a letter. In such cases the writing itself is not admissible to prove the truth of its recitals unless it can qualify under an exception to the hearsay

---

1. Appellants argue that the insurance limit and settlement amount should not have been admitted, but they raised no objection at trial and on the contrary agreed several times to the inclusion of this information in the stipulation. While it may have been prejudicial and while it should have been excluded, the issue was waived.

2. In our research of this problem, two cases were found in other jurisdictions which were directly on point. In *Rindlisbaker v. Wilson*

(1974), 95 Idaho 752, 519 P.2d 421, the Idaho Supreme Court in admitting a covenant not to sue stated that it found no independent rule of law which states that statements which are self-serving must be excluded. To the contrary is *Tough v. Ives* (1972), 162 Conn. 274, 294 A.2d 67, in which the Connecticut Supreme Court held that self-serving statements contained in a covenant not to sue were inadmissible hearsay declarations.

rule. Thus two distinct rules are involved, the one relating to proof of what the instrument contains and the other relating to the probative effect of its recitals. The best evidence rule applies only in the case of the former. . . ."

The decision as to whether a document containing self-serving statements should be admitted rests within the discretion of the court. And if the action of the trial court can be sustained upon any theory, we must affirm. *Town of Highland v. Powell, supra*, 341 N.E.2d at 808. It is reasonable to say that the Diases sought to introduce the self-serving statements to prove the truth of the matter asserted therein, i. e., that Daisy-Heddon was primarily liable for the injury, not David Hanson or his parents. These hearsay assertions cannot be said to be terms of the loan receipt agreement. And since they are truly hearsay statements (offered to prove the truth of those recitals), they are only admissible if they come within an exception to the hearsay rule. *Amer. United Life Ins. Co. v. Peffley* (1973), 158 Ind.App. 29, 301 N.E.2d 651.

For policy reasons, this result is the best. To say that self-serving statements contained within a legal document such as a loan receipt agreement are admissible would be to invite and encourage parties to include them, resulting in a perversion of the law.

The appellants also argued that the reasons they entered into the loan receipt agreements contained in the loan receipt agreement should have been admitted. But as the appellants during closing argument made clear to the jury those very reasons which were contained in the loan receipt agreement, they were not harmed.

The judgment is affirmed.

Affirmed.

GARRARD, P. J., and STATON, J., concur.